Christopher Sproul (Bar No. 126398)
Jodene Isaacs (Bar No. 226895)
Brian Orion (Bar No. 239460)
ENVIRONMENTAL ADVOCATES
5135 Anza Street
San Francisco, California 94121
Telephone: (415) 533-3376
Facsimile: (415) 358-5695
Email: csproul@enviroadvocates.com, jisaacs@enviroadvocates.com

Daniel Cooper (Bar No. 153576)
LAWYERS FOR CLEAN WATER, INC.
1004-A O'Reilly Avenue
San Francisco, California 94129
Telephone: (415) 440-6520
Facsimile: (415) 440-4155
Email: daniel@lawyersforcleanwater.com

Jason Flanders (Bar No. 238007)
SAN FRANCISCO BAYKEEPER
785 Market Street, Suite 850
San Francisco, California 94103
Telephone: (415) 856-0444
Facsimile: (415) 856-0443
Email: jason@baykeeper.org

Attorneys for Plaintiff
SAN FRANCISCO BAYKEEPER

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

| | |
|---|---|
| BAYKEEPER, INC., d/b/a SAN FRANCISCO BAYKEEPER, a California non-profit corporation,<br><br>   Plaintiff,<br><br>   v.<br><br>CITY OF SAN BRUNO, a California municipal corporation,<br><br>   Defendant. | Civil Case No.:  CV 10-00753 SC<br><br>**CONSENT DECREE** |

# CONSENT DECREE

The following Consent Decree is entered into by and between Plaintiff San Francisco Baykeeper ("Plaintiff" or "Baykeeper"), and Defendant City of San Bruno ("Defendant" or "City") (collectively, "the Parties").

**WHEREAS**, Baykeeper is a non-profit public benefit corporation dedicated to, among other things, the protection and enhancement of the water quality of the San Francisco Bay;

**WHEREAS**, the City is a municipal corporation established by California state law;

**WHEREAS**, the City is regulated by the Federal Water Pollution Control Act, 33 U.S.C., §§ 1251 *et seq.* ("Clean Water Act"), California Water Code sections 13000 *et seq.* (the "Porter-Cologne Act"), and the General Waste Discharge Requirements for Sanitary Sewer Systems, State Water Resources Control Board Order No. 2006-0003-DWQ and Monitoring and Reporting Program No. 2006-0003-DWQ, as amended by Order No. WQ 2008-0002-EXEC ("SSO WDR");

**WHEREAS**, the City owns and/or operates a sewage collection system ("Collection System") that serves San Bruno;

**WHEREAS**, the Collection System is intended to convey sewage to the South San Francisco Water Quality Control Plant ("the WQCP");

**WHEREAS**, on December 19, 2009, Baykeeper issued a sixty (60) day notice letter ("Notice Letter") to the City. The Notice Letter informed the City of alleged violations of the Clean Water Act and of Baykeeper's intention to file suit against the City. The Notice Letter was sent to the Administrator of the United States Environmental Protection Agency ("EPA"), the Administrator of EPA Region IX, and the Executive Director of the State Water Resources Control Board ("State Board"), as required by section 505(b)(1)(A) of the Clean Water Act, 33 U.S.C. § 1365(b)(1)(A). The Notice Letter was also sent to the Executive Officer of the Regional Water Quality Control Board, San Francisco Region, ("Regional Board");

**WHEREAS**, on February 23, 2010, Baykeeper filed its complaint (the "Complaint") against the City in the United States District Court for the Northern District of California ("District Court");

**WHEREAS**, the City denies Baykeeper's allegations that it has violated the Clean Water Act

1   and denies it has liability to Baykeeper;

2   **WHEREAS**, the Parties, through their authorized representatives and without either adjudication

3   of the Complaint's claims or admission by the City of any alleged violation or other wrongdoing, have

4   chosen to resolve this action through settlement to avoid the costs and uncertainties of further litigation;

5   **WHEREAS**, all actions taken by the City pursuant to this Consent Decree shall be made in

6   compliance with all applicable federal, state and local rules and regulations;

7   **WHEREAS**, for purposes of settlement, the Parties waive all objections that they may have to

8   the District Court's decision to enter and retain jurisdiction over this Consent Decree.

9   **NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES AND**

10   **ADJUDGED, ORDERED AND DECREED BY THE COURT AS FOLLOWS:**

## I.  GENERAL OBJECTIVES

12   1.   The objectives of this Consent Decree are:

13   a.   To ensure that the City reduces and prevents sanitary sewer overflows;

14   b.   To ensure that the City complies with the Clean Water Act;

15   c.   To further the goals and objectives of the Clean Water Act.

## II.  DEFINITIONS

17   2.   Unless otherwise expressly defined herein, terms used in this Consent Decree that are

18   defined in the Clean Water Act or in regulations, or in rules promulgated under the Clean Water Act,

19   have the meaning assigned to them in the applicable statutes, regulations, or rules.  Whenever terms

20   listed below are used in this Consent Decree, the following definitions apply:

21   (a)   "Consent Decree" means this Consent Decree, the District Court's Stipulated

22   Order of Dismissal, and any exhibits or documents incorporated by reference to this Consent Decree.

23   (b)   "CCTV" means closed-circuit television.

24   (c)   "CIP" means capital improvement program.

25   (d)   "CIP Budget" means the City's CIP budget which is updated on an annual basis to

26   allocate funds for sewer system capital improvement projects.

27   (e)   "City" means the City of San Bruno.

28

1  (f)  "Collection System" means the sewer pipes and lines, manholes or maintenance

2  holes, pump stations, and all appurtenances thereto under ownership and responsibility of the City that

3  are used to convey wastewater generated by residential, commercial, and industrial sources to the South

4  San Francisco Water Quality Control Plant.   For purposes of this Consent Decree, the Collection

5  System does not include Private Laterals or other privately owned or operated infrastructure that may

6  connect to the City's Collection System.  In addition, the Collection System does not include lower

7  laterals for which the City has no maintenance responsibility pursuant to San Bruno Municipal Code

8  section 8.24.200 and Resolution 1976-3.

9  (g)  "Consent Decree Deliverables" means the following reports required of the City

10  pursuant to this Consent Decree:  the SSMP or any modified SSMP pursuant to Part VIII, any Action

11  Plan pursuant to Part IX, the SSO Reduction Plan pursuant to Part X,  the Capacity Assurance Plan

12  pursuant to Part XVII and any Annual Summary Report pursuant to Part XXI.

13  (h)  "Day" means a calendar day.  In computing any period of time under this Consent

14  Decree, where the last day of such period is a Saturday, Sunday, or Federal or State Holiday, the period

15  runs until the close of business on the next day that is not a Saturday, Sunday, or Federal or State

16  Holiday.

17  (i)  "Design Storm" means a 10-year return period rainstorm with a duration of 24

18  hours, as measured by a properly calibrated and maintained rain gage that records hourly rain data

19  within the City and that will be maintained through the Termination Date of this Consent Decree, or if

20  no such gage is available, at the San Francisco International Airport.  The engineering design criteria to

21  be used by the City for a 10-year 24-hour storm shall take into account short duration intense rainfall

22  periods by reference to United States Department of Agriculture Urban Hydrology for Small Watersheds

23  guidance TR-55 (June 1986) and use of the synthetic rainfall distribution curve (Figure B-1 SCS 24-

24  Hour Rainfall Distribution) found in Appendix B of TR-55. The City shall use the distribution curve for

25  a Type I storm as referenced on Figure B-1 of Appendix B of TR-55 based on local rainfall quantities

26  for the areas served by the City in San Mateo County, California.

27  (j)  "FOG" means fats, oil, and grease.

28

(k)   "Force Main" means the pipelines within the Collection System that convey wastewater under pressure from the discharge side of a pump or pneumatic ejector to a discharge point.

(l)   "Gravity Sewer" means pipes within the City Collection System that convey wastewater by gravity flow.

(m)   "Infiltration" means water other than wastewater that may enter the Collection System through the pipes, joints, or cracks.

(n)   "Inflow" means water other than wastewater that may enter the Collection System through unpermitted connections, drains, or manholes.

(o)   "I/I" means infiltration and inflow.

(p)   Interest" means interest at a rate established by the Secretary of the Treasury pursuant to 28 U.S.C. § 1961, calculated from the date payment is due under this Consent Decree through the date of actual payment.

(q)   "NPDES" means National Pollutant Discharge Elimination System.

(r)   "Pipeline Assessment Condition Protocol" or "PACP" means the pipeline assessment and certification process established by the National Association of Sewer Service Companies.

(s)   "Private Lateral" means the private sanitary sewer lateral or line connecting a home or other structure to the Collection System.

(t)   "Sanitary Sewer Overflow," "overflow", or "SSO" has the same meaning as those terms are defined in Section A.1. of the SSO WDR, or any amendment thereto, and which currently means: "any overflow, spill, release, discharge or diversion of untreated or partially treated wastewater from a sanitary sewer system.  SSOs include:  (i) Overflows or releases of untreated or partially treated wastewater that reach waters of the United States; (ii) Overflows or releases of untreated or partially treated wastewater that do not reach waters of the United States; and (iii) Wastewater backups into buildings and on private property that are caused by blockages or flow conditions within the publicly owned portion of a sanitary sewer system.  For purposes of this definition, "waters of the United States" has the meaning as set forth in 40 C.F.R. § 122.2.

(u)    "Sewer Line Segment" means any section of publicly owned sewer line or pipe located between: (1) two manholes/maintenance holes; (2) a pump station and a manhole/maintenance hole; (3) a pump station or a manhole/maintenance hole and a headworks structure; or (4) a sewer line or pipe otherwise identifiable as a discrete section.

(v)    "SSMP" means the Sewer System Management Plan implemented by the City to monitor the condition, maintenance, and repair of the Collection System.

(w)    "Year" shall mean calendar year, unless otherwise specified.

## III.   JURISDICTION AND VENUE

3.    This District Court has jurisdiction over the subject matter of the claims asserted by Baykeeper pursuant to section 505(a)(1) of the Clean Water Act, 33 U.S.C. § 1365(a)(1), 28 U.S.C. §§ 1331 and 2201 (an action for declaratory and injunctive relief arising under the Constitution and laws of the United States).

4.    Venue is proper in this judicial district pursuant to sections 309(b) and 505(c) of the Clean Water Act, 33 U.S.C. §§ 1319(b), 1365(c), and 28 U.S.C. §§ 1391(b) and (c).

5.    The Complaint filed herein states claims for which relief can be granted against the City pursuant to section 505 of the Clean Water Act, 33 U.S.C. § 1365.

6.    Baykeeper has standing to bring this action.

7.    The District Court shall retain jurisdiction over this matter for purposes of interpreting, modifying or enforcing the terms of this Consent Decree, or as long thereafter as is necessary for the District Court to resolve any motion to enforce this Consent Decree.

## IV.   EFFECT OF CONSENT DECREE

8.    Baykeeper does not, by its consent to this Consent Decree, warrant or aver in any manner that the City's compliance with this Consent Decree will constitute or result in compliance with any federal or state law or regulation.  This Consent Decree is neither a permit nor a modification of existing permits under any federal, state, or local law and in no way relieves the City of its responsibilities to comply with all applicable federal, state, and local laws and regulations.

9.    Nothing in this Consent Decree shall be construed as an admission by the City, and does

1   not intend to imply any admission as to any fact, finding, issue of law, or violation of law, nor shall

2   compliance with this Consent Decree be construed as an admission by the City of any fact, finding,

3   conclusion, issue of law, or violation of law.

4         10.    Compliance with this Consent Decree, including the payment of all civil and stipulated

5   payments and Interest accrued thereon, and the completion of all Supplemental Environmental Projects

6   required pursuant to this Consent Decree resolves Baykeeper's civil claims for the violations alleged

7   against the City in the Complaint.

8         11.    Upon the Effective Date of this Consent Decree, Baykeeper hereby releases the City, and

9   its officials, officers, employees and successors and assigns, from any and all claims related to SSOs that

10   have or could have been claimed in the Complaint, known or unknown, up to and including the

11   Effective Date of this Consent Decree, including, but not limited to, any alleged violations of the City's

12   municipal separate storm sewer system NPDES permit ("MS4 Permit") related to SSOs.  Except for

13   claims for the City's failure to comply with this Consent Decree, Baykeeper further releases the City,

14   and its successors and assigns, from all claims pertaining to SSOs that may occur between the Effective

15   Date and the termination of this Consent Decree, including, but not limited to, any alleged violations of

16   the City's MS4 Permit related to SSOs.

17   **V.  APPLICABILITY**

18         12.    The provisions of this Consent Decree apply to and bind the Parties, including any

19   successors or assigns.  The Parties certify that their undersigned representatives are fully authorized to

20   enter into this Consent Decree, to execute it on behalf of the Parties, and to legally bind the Parties to its

21   terms.

22         13.    The Parties agree to be bound by this Consent Decree and not to contest its validity in

23   any subsequent proceeding to implement or enforce its terms.  By entering into this Consent Decree, the

24   City does not admit liability for any purpose as to any allegation or matter arising out of the Notice

25   Letter and/or Complaint.

26         14.    No change in ownership or corporate or other legal status of the City or any transfer of

27   the City's assets or liabilities shall in any way alter the responsibilities of the City, or any of its

28

successors or assigns, under this Consent Decree.

15.     In any action to enforce this Consent Decree, the City shall not raise as a defense the failure by any of its agents, servants, contractors, employees, and successors or assigns to take actions necessary to comply with this Consent Decree.

## VI.   EFFECTIVE DATE AND TERMINATION DATE

16.     The term "Effective Date," as used in this Consent Decree, shall mean the last date for the United States Department of Justice ("DOJ") and the U.S. Environmental Protection Agency ("EPA") to comment on the [proposed] Consent Decree, i.e., the forty-fifth (45th) day following the DOJ and EPA's receipt of the [proposed] Consent Decree and Stipulated Dismissal, or the date on which DOJ and EPA provide notice that no further review is required and the District Court enters the final Consent Decree, whichever occurs earlier.

17.     This Consent Decree shall automatically and unconditionally terminate ten (10) years from the Effective Date ("Termination Date") unless the City seeks early termination pursuant to Paragraph 18. Notwithstanding the foregoing, this Consent Decree shall not terminate until at least six months have elapsed since the City provided to Baykeeper the Final Compliance Report due pursuant to Paragraph 64.

18.     The City may seek early termination of this Consent Decree if the City has no more than four SSOs from the Collection System in a given calendar year followed by no more than three SSOs from the Collection System in the succeeding calendar year.  The City shall initiate early termination by submitting a letter to Baykeeper demonstrating that it has satisfied the conditions of early termination set forth in this paragraph.  Baykeeper shall respond to the City's letter within twenty (20) days indicating whether it agrees with the City's contentions or request more information to determine whether to agree with the City's contentions. If Baykeeper agrees with the City's contentions, then the City shall prepare and file a joint motion for termination of this Consent Decree, which Baykeeper shall sign.  If Baykeeper disagrees with the City's contentions, then the matter shall be subject to the dispute resolution provisions of Part XXIV.

## VII.  SSO REDUCTION PERFORMANCE STANDARDS

19.     The City shall reduce its SSOs to comply with the following SSO Reduction Performance Standards:

a.      Limitation on total SSOs per year:

| Calendar Year | Maximum  Number of SSOs Per Year |
|---|---|
| 2011 | 32 |
| 2012 | 28 |
| 2013 | 24 |
| 2014 | 16 |
| 2015 | 11 |
| 2016 | 8 |
| 2017 | 6 |
| 2018 | 4 |
| 2019 | 3 |

Limitation of total SSOs exceeding 1,000 gallons to no more than the following:

| Calendar Year | Total SSOs Exceeding 1000 Gallons |
|---|---|
| 2011-12 | 4 |
| 2013-14 | 3 |
| 2015-16 | 2 |
| 2017 and subsequent years | 1 |

b.      Upon completion of the capital improvement projects required by the City's Capacity Assurance Plan required by Part XVII, the City shall have no capacity-related SSOs from the Collection System, except for those caused by storm events exceeding the Design Storm.

c.      The City shall have no repeat spills due to pipe defects, grease, roots, or debris within one year from the same sewer line segment or manhole.

20.     For purposes of determining compliance with the SSO Reduction Performance Standards, SSOs caused by storm events exceeding the Design Storm shall not be counted.

21.     Compliance or non-compliance with the SSO Reduction Performance Standards shall be documented by the City in each Annual Summary Report required under Part XXI of this Consent Decree.

## VIII.   SSMP REQUIREMENT

22.     By September 30, 2011, the City shall develop and submit to Baykeeper a comprehensive revised SSMP, set forth as a single integrated document, that fully complies with the SSO WDR, any administrative orders issued by the Regional Board, and this Consent Decree.  The SSMP shall set forth the measures, and an implementation schedule for the measures, that the City is and will in the future employ to attain a well-maintained and operated Collection System.  The SSMP shall further be designed to achieve compliance with the SSO Reduction Performance Standards, and meeting these standards shall be a criterion for determining the adequacy of the SSMP.  The City shall update the SSMP as needed to remain in full compliance with the SSO WDR, any applicable Regional Board administrative orders, and this Consent Decree.  The City shall transmit any amended versions of its SSMP to Baykeeper within thirty (30) days of adopting an amended SSMP.

## IX.   ACTION PLAN

23.     If any Annual Summary Report provided by the City to Baykeeper pursuant to Part XXI of this Consent Decree documents SSOs in excess of this Consent Decree's SSO Reduction Performance Standards other than the SSO Reduction Performance Standard for 2019, the City shall submit to Baykeeper by June 1st of that same year an Action Plan that specifies the actions taken in the prior calendar year pursuant to this Consent Decree, and additional measures to be taken during the upcoming calendar year and thereafter, which are designed to achieve compliance with the SSO Reduction Performance Standards.  The Action Plan shall include a proposed schedule for implementation of all actions proposed.  The City shall not have an obligation to submit an Action Plan for failing to meet the SSO Reduction Performance Standard for 2019.

24.     Notwithstanding the provisions of Paragraph 23, the City shall have no obligation to prepare an Action Plan in any given year if it submits to Baykeeper, by the date an Action Plan would otherwise be due, a statement demonstrating through properly signed, contemporaneous records or other

relevant evidence contemporaneous with the SSO that it did not comply with SSO Reduction Performance Standards because of one or more SSOs that meet all of the following conditions: (i) the SSOs were caused by severe natural conditions (such as hurricanes, tornados, widespread flooding, earthquakes, tsunamis, and other similar natural conditions) or a human-caused catastrophe such as a catastrophic fire, contractor excavation damage to a sewer line or vandalism; and (ii) the City had no feasible alternatives, in the exercise of reasonable engineering judgment, that it could have implemented to avoid the SSO, such as the use of auxiliary treatment facilities, retention of untreated wastewater, reduction of inflow and infiltration, use of adequate backup equipment, an increase in the capacity of the system, education of contractors concerning damage to sewer lines or other sewer system assets, or anti-vandalism measures.

25.    The City shall include in the Action Plan the measures necessary to achieve future compliance with the SSO Reduction Performance Standards.

## X.  SSO REDUCTION PLAN

26.    Within thirty (30) days from the Effective Date, the City shall prepare an SSO Reduction Plan.  The SSO Reduction Plan shall include (i) an analysis of historical SSOs (location, cause, maintenance history, and available closed circuit television (CCTV) data), (ii) review of existing maintenance activities and practices, and (iii) recommendations for changes to sewer cleaning methods, tools, and schedules to reduce the frequency of SSOs to, at a minimum, the SSO Reduction Performance Standards specified in Part VII of this Consent Decree. By December 31, 2011, the City shall implement the recommendations in the SSO Reduction Plan, and shall periodically review and revise the strategy implemented as appropriate and necessary to achieve, at a minimum, the SSO Performance Reduction Standards specified in Section VII of this Consent Decree.

## XI.  IMPLEMENTATION OF FATS, OILS AND GREASE PROGRAM

27.    The City shall cooperate with the City of South San Francisco ("South San Francisco") to further develop and improve a FOG Program for San Bruno that will be implemented by South San Francisco. The FOG Program shall include: (a) a residential outreach program to educate the public on

proper FOG disposal in order to reduce the discharge of FOG to the City Collection System from residential sources, (b) a commercial outreach program to educate commercial establishments with the potential to discharge FOG to the sanitary sewer system on the use of Best Management Practices ("BMPs"), and the proper maintenance of grease recovery devices to reduce FOG from commercial sources consistent with the device manufacturer's requirements, (c) inspections of FSEs to monitor and evaluate FSEs' implementation of BMPs and operation and maintenance of their grease recovery devices (if applicable) and (d) appropriate enforcement against FSEs that are not complying with the City's FOG ordinances.

28.    Commencing on the Effective Date of this Consent Decree and continuing through Consent Decree termination, the City shall cooperate with and assist South San Francisco as necessary in the latter's implementation of the joint FOG Program that will encompass FSEs in San Bruno.  The City shall ensure that it, or South San Francisco implements a FOG Program for San Bruno that is comparable to the FOG Program that South San Francisco is obligated by all applicable legal obligations to implement within the latter's own city limits (including but not limited to any FOG program requirements of any consent decree or judgment entered in *Baykeeper v. South San Francisco*, Civ No. 10-00921 SBA (N.D. Cal.).  The City shall continue to ensure that it or South San Francisco implements a FOG Program for San Bruno that is at least the equivalent of the FOG Program required by any consent decree or judgment entered in *Baykeeper v. South San Francisco*, Civ No. 10-00921 SBA (N.D. Cal.) for the term of this Consent Decree regardless of the life of the consent decree or judgment in *Baykeeper v. South San Francisco*.

29.    The City shall review its existing Ordinances no later than November 30, 2011 and identify any modifications needed to the Ordinances to provide the authority for the City to cooperate fully with South San Francisco in the latter's implementation of a joint FOG Program that will encompass San Bruno.  The City Manager shall propose and recommend to the City Council any such

necessary modifications to the City's Ordinances by January 31, 2012. The City Council shall take final action on such modifications within sixty (60) days of receiving the City Manager's recommendations.

30.     Nothing in the foregoing paragraphs shall preclude San Bruno from assuming responsibility for implementing a FOG Program in the future in lieu of South San Francisco implementing the City's FOG Program. The City may at any point during the life of this Consent Decree notify Baykeeper in writing that it intends to implement a FOG Program that meets the substantive requirements set forth in the above paragraphs. Upon Baykeeper's receipt of written notice from the City pursuant to this paragraph, this Consent Decree shall be deemed revised to require the City to implement its new City FOG Program in lieu of the FOG Program implemented by South San Francisco.

## XII.  ROUTINE SEWER CLEANING AND HOT SPOTS CLEANING PROGRAMS

31.     The City shall continue to implement a routine sewer cleaning program that includes scheduled routine cleaning of all gravity sewers. By December 31, 2011, the City shall develop and implement an enhanced Sewer Cleaning Program for the gravity sewers in its Collection System that details all cleaning activities necessary to reduce or prevent SSOs. The Sewer Cleaning Program shall include (i) an initial system-wide proactive cleaning of all gravity sewers within three (3) years; (ii) preventive cleaning of problem gravity sewers segments, including problem lower laterals maintained by the City ("Hot Spots"), to prevent recurring SSOs; (iii) condition-based proactive cleaning of all gravity sewers with a cleaning cycle not to exceed 10 years for any specific gravity sewer; and (iv) cleaning activities to be scheduled and tracked by the City. Completion of an initial system-wide proactive cleaning of all gravity sewers within three years requires that the City attempt to clean every Sewer Line Segment within three years, and for those Sewer Line Segments for which cleaning cannot be properly accomplished due to sewer line condition or access limitations, that the City repair and reattempt to clean such lines in accordance with the time set forth in Paragraph 37.

32.     By December 31, 2011, the City shall acquire another combination sewer cleaning truck to aid in the City's implementation of its improved Routine Sewer Cleaning and Hot Spot Cleaning Programs.

33.     The City's Hot Spot Cleaning Program shall include three (3) month, six (6) month, and twelve (12) month cleaning cycles, and more frequent cleaning cycles if necessary to prevent sewer line conditions that risk sewer line blockages from root intrusion or build-up of debris or FOG, as described below.  Until the City's proposed Hot Spot Cleaning Program is implemented, San Bruno shall continue to implement its current weekly inspections and cleaning program. The City shall include any main line Sewer Line Segments that experience blockages caused by roots, debris, FOG, or poor pipe condition in the Hot Spot Cleaning Program at no less than a three (3) month cleaning frequency.  Any main line Sewer Line Segment receiving a PACP maintenance grade of four (4) or five (5) during condition assessments shall be included in the Hot Spot Cleaning Program at no less than a three (3) month cleaning frequency.  Any main line Sewer Line Segment receiving a PACP maintenance grade of three (3) shall be added to the Hot Spot Cleaning Program at no less than a six (6) month cleaning frequency. Main line Sewer Line Segments that receive a Sewer Cleaning Result Matrix score of "heavy," as described in the Sewer Cleaning Results Matrix in Paragraph 34 below, shall be added to the Hot Spot Cleaning Program at an initial six (6) month cleaning frequency.  Cleaning frequency for Sewer Line Segments that are part of the Hot Spot Cleaning Program shall be modified based on the Sewer Cleaning Results Matrix in Paragraph 34.

34.     The City shall collect all observations made by its sewer cleaning crews regarding the extent and nature of materials removed during the cleaning process.  The observations shall be recorded in the City's computerized information management system.  The City shall maintain or change the frequency of cleaning for a Sewer Line Segment in its Hot Spot Cleaning Program based on the Sewer Cleaning Results Matrix below in accordance with the section labeled "Action."

**Sewer Cleaning Results Matrix**

|  | Clear | Light | Moderate | Heavy |
|---|---|---|---|---|
| **Debris** | No observable debris | Minor amount of | Moderate amounts of | Significant amounts of |

| | | debris<br>1 pass | debris<br>2-3 passes | debris<br>More than 4 passes<br>Operator concern for future stoppage |
|---|---|---|---|---|
| **Grease** | No observable grease | Minor amounts of grease<br>15 minutes or less to clean<br>1 pass | Small "chunks"<br>No "logs"<br>15-30 minutes to clean<br>2-3 passes | Big "chunks" or "logs"<br>More than 4 passes<br>Operator concern for future stoppage |
| **Roots** | No observable roots | Minor amounts of roots<br>1 pass | Thin stringy roots<br>No "clumps"<br>2-3 passes | Thick roots<br>Large "clumps"<br>More than 4 passes<br>Operator concern for future stoppage |
| **Debris:**<br>Structural pipe fragments soil, rock, etc. | No observable materials | Specify material (if possible)<br>Minor amounts of material | Specify material<br>Moderate amounts of material per line segment | Specify material<br>Significant amounts of material per line segment<br>Operator concern for future stoppage |
| **Action** | Decrease frequency to next lower frequency after 3 consecutive results (e.g. 6 months to 12 months) | Continue current maintenance frequency | Increase current maintenance frequency to next higher frequency (e.g. 6 months to 3 months, or more frequently if necessary) | Increase current maintenance frequency to next higher frequency (e.g. 6 months to 3 months or more frequently if necessary) |

35.     Changes in cleaning frequency based upon cleaning results shall be as follows:

a.     No reduction in cleaning frequency shall be made in a Sewer Line Segment with a previous history of SSOs without the approval of an appropriate Collection System maintenance supervisor (or appropriate title);

b.     Three (3) consecutive results of "clear," or a CCTV inspection showing no maintenance defects that are likely to cause an SSO coupled with information indicating that non-sewer line condition related factors (such as the line being located in an area that is prone to FOG discharges to the sewer line) do not warrant more frequent cleaning, will cause the cleaning frequency to be reduced to the next lower cleaning frequency;

c.     Results of "moderate" or "heavy" will cause the cleaning frequency of the Sewer Line Segment to be increased to the next highest frequency.

36.     The City shall institute and maintain a quality assurance/quality control program ("QA/QC Program") adequate to ensure proper and complete cleaning of sewers. The QA/QC Program shall consist of spot-checking the cleaning quality in a minimum of two (2) Sewer Line Segments of the cleaned sewers on a monthly basis using CCTV to ensure adequate cleaning. If the cleaning is found to be inadequate, the Sewer Line Segment will be re-cleaned within thirty (30) days. If more than one of the spot-checked Sewer Line Segments require re-cleaning in any given month, spot-checking of the system shall be increased to four (4) Sewer Line Segments. Where spot-checking of the system has increased to four (4) Sewer Line Segments pursuant to this section, such spot checking will not be reduced to two (2) Sewer Line Segments until three (3) consecutive months show one Sewer Line Segment or less inspected requires re-cleaning. If a required inspection frequency increase is identified by a single crew, the increased inspection schedule will only apply to that crew.

37.     If routine sewer cleaning or hot spot cleaning of a Sewer Line Segment or area cannot be properly accomplished due to sewer line condition, the City shall CCTV the Sewer Line Segment and address any observed defects in accordance with the Timeframe for Actions to Correct Observed Defects table set forth in Paragraph 54. In the event that proper cleaning cannot be accomplished due to access limitations, the access restraint shall be remedied or repaired within one hundred and twenty days of discovery, or in the event a permit or permission from a third party is required to structurally alter or access the Sewer Line Segment, within one hundred and twenty (120) days of obtaining the necessary permits or permission.

38.     If the City's Routine Cleaning Program or Hot Spot Cleaning Program fails to reduce the SSO rate to the SSO Reduction Performance Standard for calendar year 2013 set forth in Paragraph 19.a, the City shall evaluate and revise its current cleaning protocols. The revised protocols shall be included in the City's Action Plan for calendar year 2013.

## XIII.   ROOT CONTROL PROGRAM

39.     To assure compliance with the SSO Reduction Performance Standards in Part VII of this

Consent Decree, the City shall implement a modified Root Control Program.  By December 31, 2011,

the Discharger shall identify and initiate measures to improve the effectiveness of its Root Control

Program.  The improvements shall be sufficient to reduce and eliminate or prevent root-related SSOs

within the timeframes provided in SSO Reduction Performance Standards in Part VII.  The Root Control

Program shall utilize cleaning results and CCTV inspection data to identify gravity sewers with

significant root intrusion and shall control root intrusion in those gravity sewers with significant levels

of root intrusion using mechanical root removal and/or chemical root control.  Under this program, the

City shall perform mechanical root cleaning of any Sewer Line Segment that receives a PACP grade of

four (4) or five (5) due to root intrusion during condition assessments, any Sewer Line Segment that

experiences an SSO caused by root intrusion, and any Sewer Line Segment that receives a sewer

cleaning result of "heavy" for roots at an initial twelve (12) month cleaning frequency.   If any root

intrusion is determined to be caused by a defective Private Lateral, the City shall either require repair or

replacement of the defective Private Lateral within ninety (90) days, or shall place the sewer line

segment in issue on the Hot Spot Cleaning Program with specification for mechanical root removal with

a frequency sufficient to avoid the re-growth of roots into that line.

   40.  The City shall not use chemicals as part of its root control program in a fashion that

would cause such chemicals to pass through the WQCP or interfere with treatment provided by the

WQCP.  To the extent the City employs chemical root control, the City shall apply root control

chemicals approved by EPA or the state in accordance with the manufacturer's instructions.  The City

shall annually evaluate its chemical root application program.  In this evaluation, the City shall consider

information about the past effectiveness of its chemical root control applications and any information

about environmental harms caused by these applications.  The City shall also consider all other current,

reasonably available information concerning application of root control chemicals in a fashion that is

both effective and minimizes any risk of treatment plant pass through or interference.

## XIV.   INFORMATION MANAGEMENT

   41.  Commencing within one hundred and eighty (180) days of the Effective Date, the City

shall implement and maintain a continuously updated computerized maintenance management system ("CMMS"), linked to GIS, to record and track pertinent asset management, operations, and maintenance. This information system shall be used in conjunction with the City's GIS database to track and make readily available to relevant City employees and contractors information concerning SSO history, sewer line cleaning, sewer line and manhole spot repairs, sewer line CCTV inspections, gravity and force main sewer line condition assessment, sewer line rehabilitation and replacement projects, pump station condition assessments, pump station repair projects and other information necessary to plan system operation and maintenance and capital improvement.

42.     The City shall update its GIS and/or CMMS database by June 30, 2012 to include all Collection System attributes that will facilitate Collection System operation and maintenance to the extent such data is reasonably available. The City shall regularly revise and update its CMMS and/or GIS database as the City acquires new information. The following information shall be included in the City's GIS, CMMS, or other database to the extent reasonably available: (1) for sewer lines— construction material, year of construction, inspection history, cleaning history, repair history, and any known structural defects; (2) for manholes—locations, repair history, and any known structural defects; and (3) for pump stations—year of construction, status of mechanical and electrical components, spare parts inventory, availability of backup power and pumping capabilities, wet well storage capacity, average and peak flow, pumping capacity, inspection history, maintenance and repair history, and any known structural defects.

The City shall employ its CMMS: (a) to track the effectiveness of the Routine Sewer and Hot Spot Cleaning Programs and Root Control Programs and to assist in designing optimum Routine Sewer Cleaning and Hot Spot Cleaning Programs and root removal programs, (b) to track sewer line condition assessment, (c) to track pump station condition assessment and pump station maintenance, (d) to identify the need for and plan long term capital improvement projects, and (e) to create and track the performance of work orders.

## XV. SEWER AND MANHOLE CONDITION ASSESSMENT

43.     The City shall implement a Sewer Line Condition Assessment Program as specified in

1  this Part. The City shall continue to implement its current CCTV inspection of its sewer lines and shall

2  by no later than June 30, 2012 complete CCTV inspection and condition assessment of all its sewer

3  main lines. Completion of CCTV inspection and condition assessment by June 30, 2012 requires that the

4  City attempt CCTV inspection and ranking of every segment of the Collection System.

5      44.      Any sewer line where the passage of the CCTV camera was blocked by the condition of

6  the pipe shall result in the Sewer Line Segment being defined as failed. The City shall repair all failed

7  sewer lines in such fashion as to allow inspection and shall re-inspect all such lines as expeditiously as

8  possible and in any case no later than December 31, 2014 such that on December 31, 2014, the City

9  shall have CCTV inspection data for all of its sewer mains that is no more than five years old.

10     45.      The City shall implement a Manhole Condition Assessment Program as specified in this

11  Part. By June 30, 2013, the City shall complete a visual inspection and condition assessment of all

12  manholes such that on June 30, 2013, the City shall have inspection data for all of its manholes that is

13  not more than five years old.

14     46.      The City shall employ the PACP rating system to assess the results of its CCTV

15  inspections of sewer main lines. The City shall produce and maintain a sewer line inspection and

16  grading database consisting of the City's CCTV inspection tapes and logs and the grading of its sewer

17  lines, employing the PACP rating system, based on this inspection. The City shall further adopt and

18  utilize an objective grading system for its concurrent assessment of sewer manholes.

19               **XVI. PUMP STATION REPAIR/REHABILITATION**

20     47.      By December 31, 2013, the City shall determine whether it will rehabilitate or abandon

21  the Olympic Pump Station. By July 1, 2018, the City shall complete rehabilitation or abandonment, as

22  applicable, of the Olympic Pump Station, and the Pump Station Replacement Project which includes the

23  Spyglass Pump Station, the Lomita Pump Station, and the Crestmoor Pump Station.

24     48.      The City's SSMP shall specify methods and a time schedule for future assessments of the

25  condition of the City's pump stations, including an appropriate repeat cycle for pump station condition

26  assessment. The City shall complete updated condition assessments of all its pump stations in accord

27  with its SSMP. The City shall add to its CIP any pump station repair, rehabilitation or replacement

28

projects warranted based on the results of the City's pump station condition assessment.

## XVII.   CAPACITY ASSURANCE

49.     By June 30, 2012, the City shall complete sufficient flow monitoring of the Collection System to develop, calibrate, and validate hydraulic modeling of the Collection System.

50.     By September 30, 2013, the City shall provide Baykeeper a Capacity Assurance Plan identifying all measures, including measures to reduce inflow and infiltration and/or increase flow conveyance and/or storage capacity, to convey peak wet weather flows from storms less than or equal to the Design Storm without SSOs caused by insufficient Collection System capacity.  The Capacity Assurance Plan shall include a schedule for implementation of all necessary capacity measures (including capital projects) identified in the Capacity Assurance Plan based on Design Storm criteria. Notwithstanding the foregoing, if the City determines that any capacity measures identified in the Capacity Assurance Plan based on Design Storm criteria would be cost-prohibitive to implement, the parties shall meet and confer to determine whether a more economically feasible capacity measure could be implemented.

51.     The schedule for implementation of capacity measures shall be as expeditious as is practicable.  In no event shall the completion of the construction of the improvements identified in the Capacity Assurance Plan extend beyond the Termination Date.

## XVIII.   CAPITAL IMPROVEMENT PROJECTS

52.     The City's proposed near term CIP Budget is attached hereto as Exhibit A.  The City shall complete all of the sanitary sewer replacements in its final near term CIP Budget by the deadlines stated therein, as such deadlines may be modified as changes in priorities occur.  The final near term CIP Budget shall be adopted by September 1, 2011.  The City shall provide a copy of such budget to Baykeeper within 10 days following adoption.  The CIP Budget provides and shall continue to provide for complete rehabilitation or replacement of all the City's gravity sewer lines, force main lines, and pump stations.

53.     By September 1 of each calendar year that this Consent Decree is in effect, the City shall update its CIP Budget to specify performance (and a schedule for the performance) of any new gravity

or force main sewer line rehabilitation or replacement projects (including manhole projects) identified as needed by the City's sewer line condition assessment performed in accordance with the Sewer Line and Manhole Condition Assessment Program specified in Part XV of this Consent Decree, and any pump station upgrade, rehabilitation or replacement projects identified as needed by the Capacity Assurance Plan specified in Part XVII of this Consent Decree.  The City shall include its updated CIP Budget in its Annual Summary Report to Baykeeper.  The City shall implement its CIP Budget and updated CIP Budgets as a requirement of this Consent Decree.

54.     The City shall plan and implement necessary sewer line projects to ensure adequate and well-designed asset management.  By the deadlines set in accord with this paragraph, the City shall correct all acute, discrete gravity or force main sewer line defects (i.e., perform sewer line hot spot repairs) discovered during inspections that risk causing an SSO and warrant discrete repairs.  Additionally, the City shall plan and implement larger scale needed gravity and force main sewer line rehabilitation and replacement projects.  Based on the PACP scores derived during CCTV inspections, the City's deadlines for actions to correct observed defects in relevant gravity Sewer Line Segments are shown on the table entitled "Timeframe for Actions to Correct Observed Defects" set forth below.

**Timeframe for Actions to Correct Observed Defect**

| Observed Defect | Corrective Action | Time Frame (from date defect observed) | Other Action |
|---|---|---|---|
| PACP Grade 4 or 5 Maintenance Defect | Clean sewer | 30 days | Place on Hot spot cleaning or mechanical root control schedule |
| PACP Grade 3 Maintenance Defect | Clean sewer | 4 months | Place on Hot spot cleaning or mechanical root control schedule |
| PACP Grade 5 Structural Defect – Immediate Failure Likely | Repair rehabilitate or replace sewer | ASAP (no more than 90 days) | N/A |
| PACP Grade 5 Structural Defect – Immediate Failure Unlikely | Repair, rehabilitate, replace, or re-inspect sewer | 2 years | Re-inspect within one year if corrective action not taken |
| PACP Grade 4 Structural Defect | Repair, rehabilitate, or re-inspect sewer | 5 years | Re-inspect within three years if corrective action not taken |

| PACP Grade 1 or 2 or 3 Structural Defect or PACP Grade 1 or 2 Maintenance Defect | Inspect Sewer with CCTV | CCTV as recommended in PACP | N/A |
|---|---|---|---|

55.     The City shall plan and implement necessary pump station repair, rehabilitation or replacement projects to ensure adequate and well-designed asset management.

56.     The City shall include in any updated CIP Budget it adopts pursuant to this Consent Decree updated provisions specifying:  repairs, replacements, or rehabilitation of those sewer lines that cannot be kept free of stoppages by a reasonable program of maintenance and other capital improvements (such as new or replacement manholes, improved or expanded pump stations, or flow storage and equalization facilities) as needed to avoid line breakages or collapse, any projects needed to continue to ensure adequate Collection System flow conveyance capacity and address any newly developed excessive I/I problems, and all capital projects otherwise needed to attain SSO Reduction Performance Standards.

57.     In assessing the need for and design of CIP projects the City shall consider the effects of global climate change, and how such change may affect rainfall patterns and sea level rise in accordance with any published, peer-reviewed design standards.

58.     When performing any CIP projects, the City shall inform its contractors of the requirements of the Statewide General Permit for Storm Water Discharges Associated with Construction Activities, NPDES No. CAS000002 ("Construction Stormwater Permit") and shall include provisions in its construction contracts that require its contractors to comply with the Construction Stormwater Permit and to implement construction storm water Best Management Practices sufficient to ensure compliance with all applicable municipal codes.

59.     Beginning in the Fiscal Year 2014, the City's CIP Budget shall be modified to include sewer segments requiring capacity enhancements as determined by the City's Capacity Assurance Plan.

## XIX.  PRIVATE LATERALS

60.     If the Capacity Assurance Plan concludes that the City's collection system does not have

1   adequate capacity and identifies repair and replacement of Private Laterals as a cost-effective measure

2   for addressing capacity-related issues, then by February 15, 2014, the City Manager shall present and

3   recommend to its City Council for adoption amendments to its Municipal Code, with notice to

4   Baykeeper, that requires (a) testing of Private Laterals upon sale of property, a major remodel

5   (>$75,000), and any remodel that adds a bathroom or significant plumbing fixture; (b) replacement of

6   defective Private Laterals by a specified deadline; and (c) evidence from the landowner that the

7   defective Private Lateral has been repaired, rehabilitated, or replaced as condition to closing or the

8   City's sign-off on a final permit. The City Council shall take final action on the City Manager's

9   recommendation within sixty days.  If the City Council does not enact the Ordinance, within ninety

10  days, the City shall adopt and commence implementation of an alternative means for securing the

11  replacement of such defective Private Laterals at a rate equivalent to the rate of replacement that would

12  have been secured by implementation of the Ordinance.

13          61.     If the requirements in Paragraph 60 are not triggered, the City shall comply with the

14  requirements set forth in this Paragraph instead.   By February 15, 2014, the City Manager shall present

15  and recommend to its City Council for adoption amendments to its Municipal Code, with notice to

16  Baykeeper, that requires (a) property owners of homes constructed during the period when Orangeburg

17  pipe use was prevalent (1940 – 1960) to inspect their Private Laterals upon sale of their property; (b) to

18  replace defective Orangeburg Private Laterals by a specified deadline as a requirement of transfer of the

19  property, and (c) to provide evidence to the City that the defective Private Lateral has been repaired,

20  rehabilitated, or replaced  by the specified deadline.  The City Council shall take final action on the City

21  Manager's recommendation within sixty (60) days.  If the City Council does not enact the Ordinance,

22  within ninety days, the City shall adopt and commence implementation of an alternative means for

23  securing inspection of such Private Laterals and replacement of defective Private Laterals at rates

24  equivalent to the rates of inspection and/or replacement that would have been secured by

25  implementation of the Ordinance.

26          **XX.  BAYKEEPER REVIEW OF CONSENT DECREE DELIVERABLES**

27          62.     Baykeeper shall have the right to review and comment upon the Consent Decree

Deliverables. Baykeeper shall provide the City, in writing, with all recommended revisions to the Consent Decree Deliverables within thirty (30) days of Baykeeper's receipt of these Deliverables. The City shall consider in good faith each of Baykeeper's recommended revisions on each Consent Decree Deliverable. If the City rejects any of Baykeeper's recommended revisions to a Consent Decree Deliverable, within twenty days of a written request from Baykeeper for either a written explanation or a meeting to confer about the City's position, the City shall, depending on Baykeeper's request, provide a written explanation or explain its position in a meeting with Baykeeper as to why Baykeeper's comments are being rejected. The Parties shall attempt to resolve any disputes regarding Consent Decree Deliverables in good faith. Neither Party shall invoke Dispute Resolution regarding a Consent Decree Deliverable until good faith efforts to resolve disputes have been completed. If Dispute Resolution is invoked regarding a Consent Decree Deliverable, to the extent the Parties do not dispute original provisions or recommended revisions, the City shall implement all undisputed provisions or revisions. After the Parties have reached agreement on the Consent Decree Deliverable or after Dispute Resolution resolves any disputes concerning the Deliverables, the City shall implement the Deliverables as enforceable requirements of this Consent Decree.

## XXI.  ANNUAL SUMMARY REPORT

63.     By March 1st of each year that this Consent Decree is in effect, the City shall submit an Annual Summary Report to Baykeeper. The Annual Summary Report shall:

(a)     Indicate whether the City met the SSO Reduction Performance Goals and explain the basis for the City's conclusions in this respect;

(b)     Summarize the City's implementation of any current SSO Reduction Action Plan, including the City's efforts to secure the necessary funding to implement such Plan;

(c)     Report the number and location of SSOs caused by FOG from residential versus commercial sources. The Report shall further summarize the City's efforts to implement its FOG Program pursuant to Part XI;

(d)     Summarize the City's implementation of its Routine Sewer Cleaning Program and Hot

Spot Cleaning Program pursuant to Part XII;

     (e)    Summarize the City's implementation of its Root Control Program pursuant to Part XIII;

     (f)    Summarize the City's implementation of the Sewer Line and Manhole Condition Assessment Program pursuant to Part XV and the CIP requirements of Part XVIII, including: (1) the number of miles of sewer line the City subjected to CCTV inspection, (2) the number of miles of gravity sewer line the City determined fell within each separate structural grade category in the City's grading system and an identification of the Sewer Line Segments receiving PACP structural defect codes of 3, 4 and 5 as well as the number of Sewer Line Segments categorized as "moderate" and "heavy" for FOG, grease and debris, (3) the City's performance of sewer line defect repairs (how many Sewer Line Segments the City repaired), (4) the City's implementation of its CIP Budget, and (7) the City's financial analysis of the costs of CIP projects compared to the revenues available for these projects and the City's conclusions concerning how the City's finances are adequate to ensure timely completion of the projects;

     (g)    Summarize the City's implementation of its Private Lateral Program pursuant to Part XIX;

     (h)    Summarize the City's annual expenditures on Collection System operation, maintenance and capital projects, the City's revenues for operation of the Collection System and WQCP from sewer fees and any bonds, and the City's adjustments (if any) to its sewer rates;

     (i)    Summarize the City's development of and implementation of its Information Management obligations pursuant to Part XIV;

     (j)    Summarize the City's annual evaluation of its chemical root control program; and

     (k)    Summarize any inspections or repairs pursuant to the City's Pump Station program pursuant to Part XVI.

     The City may omit from its Annual Summary Report any information that is stated in the City's annual report to the Regional Board provided that the City provides the latter report to Baykeeper.

     64.    The City shall provide to Baykeeper a Final Compliance Report six months prior to the Termination Date. The Final Compliance Report shall report on all the information items referred to in

1   the preceding paragraph. The Final Compliance Report shall further provide the status of all of the

2   construction and other related activities required in the Capacity Assurance Plan and the CIP Budget.

3   The report shall provide sufficient information and detail to reasonably demonstrate that the City has

4   undertaken and will have completed sufficient activities to fully comply with the requirement to reduce

5   the potential for capacity-related SSOs for rain events less than or equal to the Design Storm by the

6   Termination Date.

7       **XXII.   ENVIRONMENTAL MITIGATION PROJECT AND FEES AND COSTS**

8       65.     The City shall implement the Private Lateral Program Supplemental Environmental

9   Project(s) ("SEP I") described in Exhibit B in accord with the timelines set forth therein. The Parties

10  agree that SEP I is intended to secure significant environmental benefits to the watersheds and ocean

11  waters in and adjacent to San Bruno. The City shall fund SEP I in the amount of $199,622. The City

12  shall further implement the Marine Mammal Center SEP described in Exhibit C in accord with the

13  timelines set forth therein ("SEP II"). The City shall fund SEP II in the amount of $95,928.

14      66.     To mitigate perceived environmental harms resulting from the allegations in the

15  Complaint, the City shall pay to the Rose Foundation for Communities and the Environment the total

16  sum of Fifty Thousand Dollars ($50,000) ("the Mitigation Payment") to be used to fund environmental

17  project activities that will benefit the San Francisco Bay or its tributaries. Payment shall be made by

18  December 31, 2011, to:

19          The Rose Foundation for Communities and the Environment

20          6008 College Avenue, Suite 10

21          Oakland, California 94618

22          Attention: Tim Little

23      67.     To help defray Baykeeper's attorney's, consultant, and expert fees and costs, and any

24  other costs incurred as a result of investigating, filing this action, and negotiating a settlement, the City

25  shall pay Baykeeper the sum of One Hundred Thirty One Thousand Dollars ($131,000) which shall

26  include all attorneys' fees and costs for all services performed by and on behalf of Baykeeper by its

27  attorneys and consultants up to and through the Effective Date of this Consent Decree. The payment

28

shall be made within twenty-one (21) days of the Effective Date of this Consent Decree.  The payment shall be made in the form of a check payable to *Environmental Advocates Client Trust Account*," addressed to:  5135 Anza Street, San Francisco, CA 94121, sent via overnight delivery, and shall constitute full payment for all costs of litigation incurred by Baykeeper that have been claimed in Baykeeper's lawsuit, up to and including the Effective Date.

68.     The City agrees to compensate Baykeeper for time to be spent by legal staff or technical consultants reviewing compliance reports and any other documents, or participating in any meet and confer process under this Consent Decree.  To this end, the City shall pay the sum of Ninety Thousand Dollars ($90,000) in three payments.  The first payment of $30,000 shall be due on December 31, 2011. The second payment of $30,000 shall be due on December 31, 2012.  The third payment of $30,000 shall be due on December 31, 2013.  Payment shall be made payable to "San Francisco Baykeeper" sent via overnight delivery to San Francisco Baykeeper, 785 Market Street, Suite 850, San Francisco, California 94103-2023.  Baykeeper shall tender any compliance monitoring funds remaining upon termination of this Consent Decree to the Rose Foundation to be used to fund environmental project activities that will benefit the San Francisco Bay or its tributaries.

69.     In the event of late payment of any of the sums due referred to in this Part, the City shall pay Interest to Baykeeper, which shall accrue daily from the thirtieth (30th) day past the date the sum was due until the date the City tenders payment.

## XXIII. STIPULATED PAYMENTS

70.     Subject to Paragraph 71, if the City fails to submit to Baykeeper a Consent Decree Deliverable or Annual Report by the deadlines set forth herein, it shall be subject to the following stipulated payments:

| Period of Noncompliance | Payment Per Violation Per Day |
| --- | --- |
| Days 1-30 | $100 |
| Days 31-60 | $500 |
| Days over 60 | $1,000 |

71.     Stipulated payments shall begin to accrue on the day after the late Consent Decree Deliverable or Annual Report is due provided that, within thirty (30) business days from the applicable due date, Baykeeper provides written notice to the City that the applicable report is late.  If Baykeeper provides written notice to the City more than thirty (30) business days from the applicable due date, stipulated payments shall begin to accrue thirty (30) business days prior to the date of Baykeeper's written notice. The City shall pay any stipulated payments assessed pursuant to this Consent Decree within thirty (30) days after receipt of an invoice from Baykeeper itemizing the stipulated payment liability, or thirty (30) days after resolution of a dispute if Dispute Resolution has been invoked pursuant to Part XXIV of this Consent Decree.  Nothing in this Consent Decree shall prevent Baykeeper from waiving any stipulated payments, which might be due under this Section, based on the outcome of any Dispute Resolution proceeding or the City's good faith efforts.

72.     If the City fails to pay any of the stipulated payments required by this Consent Decree within thirty (30) days of the date such payments are due, Interest shall accrue from the date payment was due until the City makes the required payment.

73.     All stipulated payments described in this Consent Decree shall be paid by the City to the *"Rose Foundation for Communities and the Environment"* to be used solely to fund activities which benefit San Francisco Bay or its tributaries.  The City shall send payments via overnight mail to: Rose Foundation for Communities and the Environment, 6008 College Avenue, Oakland, CA 94618, Attn: Tim Little.  The City shall send notice to Baykeeper in accord with Part XXVII that it has sent any such payments to the Rose Foundation.

74.     In no case shall Baykeeper receive or use for any purpose any of the stipulated payments.

## XXIV.  DISPUTE RESOLUTION

75.     This Court shall retain jurisdiction over this matter for the purposes of adjudicating all disputes among the Parties that may arise under the provisions of this Consent Decree.  The Court shall have the power to enforce this Consent Decree with all available legal and equitable remedies, including contempt.

76.     The Dispute Resolution procedures set forth in this Part shall be the exclusive mechanism

for resolving disputes between the Parties with regard to any aspect of this Consent Decree.

77.     Either Party to this Consent Decree shall invoke the dispute resolution procedures of this Part by notifying the other Party in writing of the matter(s) in dispute and of the Party's proposal to resolve the dispute under this Part. The Parties shall then meet and confer in an attempt to resolve the dispute informally ("Informal Dispute Resolution") within thirty (30) calendar days from the date of the notice.

78.     If the Parties cannot resolve a dispute within thirty (30) calendar days from the date of the notice as specified in Paragraph 77 above, the Party invoking Information Dispute Resolution may invoke formal dispute resolution ("Formal Dispute Resolution") by filing a motion before the District Court.

79.     The prevailing Party in any Formal Dispute Resolution proceeding shall be entitled to attorneys fees and costs in accord with the standard established by 33 U.S.C. section 1365(d).

## XXV.  LODGING OF CONSENT DECREE

80.     Baykeeper shall submit a copy of this Consent Decree to DOJ and EPA within three (3) days of its execution for agency review consistent with 40 C.F.R. § 135.5. The agency review period expires forty-five (45) days after receipt by both agencies, as evidenced by the certified return receipts, copies of which shall be provided by Baykeeper to the City upon request. If the EPA or DOJ request or suggest revisions to this Consent Decree or objects to entry of this Consent Decree in the form presented, the Parties shall attempt in good faith to agree to revisions of this Consent Decree in accordance with the requested or suggested revisions provided by EPA or DOJ and/or otherwise accommodate EPA or DOJ's objections. If the District Court objects to entry of this Consent Decree in the form presented, the Parties will attempt in good faith to agree to revisions of this Consent Decree necessary so that it is acceptable to the District Court.

81.     Baykeeper shall lodge this [proposed] Consent Decree with the District Court within three (3) days of the Parties' execution of this Consent Decree. Baykeeper will thereafter promptly request the Court to enter this Consent Decree after the DOJ and EPA comment period specified by 40 C.F.R. § 135.5 (and after the completion of the meet and confer process referred to in the preceding

1   paragraph, if any).

2   **XXVI.  MUTUAL RELEASE OF LIABILITY AND FORCE MAJEURE**

3   82.     In consideration of the above, upon the Effective Date of this Consent Decree, the Parties

4   hereby fully release, except for claims for the City's failure to comply with this Consent Decree and as

5   expressly provided below, each other and their respective successors, assigns, officers, agents,

6   employees, and all persons, firms, and corporations having an interest in them, from any and all alleged

7   Clean Water Act violations claimed in the Complaint, up to and including the Effective Date of this

8   Consent Decree.

9   83.     Nothing in this Consent Decree limits or otherwise affects Baykeeper's right to address

10   or take any position that it deems necessary or appropriate in any formal or informal proceeding before

11   the Regional Board, EPA, or any other judicial or administrative body on any other matter relating to the

12   City.

13   84.     Neither this Consent Decree nor any payment pursuant to this Consent Decree shall

14   constitute or be construed as a finding, adjudication, or acknowledgement of any fact, law, or liability,

15   nor shall it be construed as an admission of violation of any law, rule, or regulation.  The City maintains

16   and reserves all defenses it may have to any alleged violations that may be raised in the future.

17   85.     The City's obligation to comply with one or more of the provisions of this Consent

18   Decree shall be deferred to the extent and for the duration that the delay in compliance is caused by an

19   event or circumstance that constitutes force majeure within the meaning of Paragraph 86.

20   86.     The City shall notify Baykeeper pursuant to the terms of this paragraph, when

21   implementation of the requirements set forth in this Consent Decree, within the deadlines set forth in

22   those paragraphs, becomes impossible, despite the timely good-faith efforts of the City, due to

23   circumstances beyond the control of the City or its agents, and which could not have been reasonably

24   foreseen and prevented by the exercise of due diligence by the City.  Any delays due to the City's failure

25   to make timely and bona fide applications and to exercise diligent efforts to comply with the terms in

26   this Consent Decree in normal inclement weather shall not, in any event, be considered to be

27   circumstances beyond the City's control.  Financial inability shall not, in any event, be considered to be

28

circumstances beyond the City's control.

87.     If the City claims impossibility, it shall notify Baykeeper in writing within thirty (30) days of the date that the City first knew of the event or circumstance that caused or would cause a violation of this Consent Decree, or the date the City should have known of the event or circumstance by the exercise of due diligence.  The notice shall describe the reason for the nonperformance and specifically refer to this Part of this Consent Decree.  It shall describe the anticipated length of time the delay may persist, the cause or causes of the delay, the measures taken or to be taken by the City to prevent or minimize the delay, the schedule by which the measures will be implemented, and the anticipated date of compliance.  The City shall adopt all reasonable measures to avoid and minimize such delays.

a.     The Parties shall meet and confer in good-faith concerning the non-performance and, where the Parties concur that performance was or is impossible, despite the timely good faith efforts of the City, due to circumstances beyond the control of the City that could not have been reasonably foreseen and prevented by the exercise of due diligence by the City, new performance deadlines shall be established.

b.     If Baykeeper disagrees with the City's notice, or in the event that the Parties cannot timely agree on the terms of new performance deadlines or requirements, either Party shall have the right to invoke the Dispute Resolution procedures pursuant to Part XXIV of this Consent Decree.  In such proceeding, the City shall bear the burden of proving that any delay in performance of any requirement of this Consent Decree was caused or will be caused by force majeure and the extent of any delay attributable to such circumstances.

## XXVII.  NOTICES AND SUBMISSIONS

88.     Any notifications, submissions, or communications to Baykeeper or to the City pursuant to this Consent Decree shall be, to the extent feasible, sent via electronic mail transmission to the e-mail addresses listed below (electronic return receipt requested) or, if electronic transmission is not feasible, via U.S. Mail or hand delivery to the following addresses.  Any change in the individuals or addresses designated by any party must be made in writing to all Parties.

1

2      If to BAYKEEPER:

3      Christopher Sproul
       Jodene Isaacs
4      Brian Orion
       ENVIRONMENTAL ADVOCATES
5      5135 Anza Street
       San Francisco, California 94121
6      Telephone: (415) 533-3376
       Facsimile: (415) 358-5695
7      Email: csproul@enviroadvocates.com, jiaacs@enviroadvocates.com,
8      borion@enviroadvocates.com

9      Jason Flanders
       Andrea Kopecky
10     SAN FRANCISCO BAYKEEPER, INC.
       785 Market Street, Suite 850
11     San Francisco, California 94103-2023
       Email: jason@baykeeper.org, andrea@baykeeper.org
12

13     If to the CITY:

14     Kenton L. Alm
       Sabrina S. Wolfson
15     Meyers, Nave, Riback, Silver & Wilson
       555 12th Street, Suite 1500
16     Oakland, CA 94607
       Telephone: (510) 808-2000
17     Facsimile: (510) 444-1108
       Email: kalm@meyersnave.com
18             swolfson@meyersnave.com
19

20     City of San Bruno
       Attn: City Manager
21     567 El Camino Real
       San Bruno, CA 94066
22     Telephone: (650) 616-7056
       Facsimile: (650) 742-6515
23

24     City of San Bruno
       Attn: City Attorney
25     567 El Camino Real
       San Bruno, CA 94066
26     Telephone: (650) 616-7056
       Facsimile: (650) 742-6515
27

28

89.     Notices submitted in accordance with this Section shall be deemed submitted on the date they are postmarked or, if sent electronically, they shall be deemed submitted upon transmission, but a notice is not effective if the sending Party learns that it did not reach the Party to be notified. Notwithstanding the sender's receipt of a successful delivery notification, a recipient that fails to receive the submission may request delivery by other means.  Such a request does not affect the timeliness of the original submission.

90.     The City also agrees to provide to Baykeeper any new or existing documents within the City's custody or control that are reasonably necessary to evaluate system performance and/or compliance with this Consent Decree within twenty (20) days of written request by Baykeeper.

91.     During the life of this Consent Decree, the City shall preserve at least one legible copy of all records and documents, including computer-stored information, which relate to performance of its obligations under this Consent Decree.

## XXVIII.  GENERAL PROVISIONS

92.     Continuing Jurisdiction.  The Parties stipulate that the District Court shall retain jurisdiction to enforce the terms and conditions of this Consent Decree and to resolve disputes arising hereunder as may be necessary or appropriate for the construction or execution of this Consent Decree up to and including the Termination Date in Paragraph 17.

93.     Construction.  The language in all parts of this Consent Decree shall be construed according to its plain and ordinary meaning, except as to those terms defined in Part II above.

94.     Choice of Law.  The laws of the United States shall govern this Consent Decree.

95.     Severability.  In the event that any provision, paragraph, section, or sentence of this Consent Decree is held by a Court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

96.     Counterparts.  This Consent Decree may be executed in any number of counterparts, all of which together shall constitute one original document.  Telecopy, scanned copies (i.e., pdf) and/or

1    facsimile copies of original signature shall be deemed to be originally executed counterparts of this

2    Consent Decree.

3       97.    <u>Modification of the Consent Decree</u>. This Consent Decree, and any provisions herein,

4    may not be changed, waived, discharged, or terminated unless by a written instrument, signed by the

5    Parties.

6       98.    <u>Full Settlement</u>. This Consent Decree constitutes a full and final settlement of this

7    matter.

8       99.    <u>Integration Clause</u>. This is an integrated Consent Decree. This Consent Decree is

9    intended to be a full and complete statement of the terms of the agreement between the Parties and

10    expressly supersedes any and all prior oral or written agreements, covenants, representations, and

11    warranties (express or implied) concerning the subject matter of this Consent Decree.

12       100.    <u>Authority</u>. The undersigned representatives for Baykeeper and the City each certify that

13    he/she is fully authorized by the settling Party whom he/she represents to enter into the terms and

14    conditions of this Consent Decree.

15       The Parties hereby enter into this Consent Decree.

16                                    CITY OF SAN BRUNO

17

18    Date: _July 29, 2011_

19                                      By: Connie Jackson, City Manager

20

21    APPROVED AS TO FORM:             For DEFENDANT SAN BRUNO

22

23    Date: _7-28-11_

24                                      By: Kenton Alm

25                                      Meyers Nave

26

27                                      For SAN FRANCISCO BAYKEEPER:

28

Date:  July 20, 2011

_Christopher A. Sproul_

_____

By: Christopher Sproul
ENVIRONMENTAL ADVOCATES

Pursuant to the stipulation of the Parties, IT IS SO ORDERED.

Dated:  September 27, 2011   _____

United States District Judge

IT IS SO ORDERED
Judge Samuel Conti
UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## Exhibit A

### Near Term CIP Budget

# WASTEWATER FUND
(Insert Divider)

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

PAGE LEFT BLANK INTENTIONALLY

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

**CAPITAL PROJECTS**
(Insert Divider)

PAGE LEFT BLANK INTENTIONALLY

## 2011-16
## WASTEWATER CAPITAL IMPROVEMENT PROGRAM

The Wastewater Enterprise Fund provides for the maintenance and implementation of capital improvements related to the wastewater collection system throughout the City, including all sewer mains, manholes, lower laterals, and seven lift stations.  The Wastewater Fund Capital Improvement Program is designed to protect, preserve, and enhance the wastewater infrastructure facilities.  The goal is to improve and/or replace existing facilities in an effort to extend the useful life of these valuable public assets.

**PROJECTS IN THE 2011-16 WORK PLAN**
> Marine Mammal Center Shade Structure Construction
> Sharp Park Neighborhood Private Sewer Lateral Grant Program

**PROJECTS IN THE 2011-16 WORK PLAN**
> Backhoe Equipment Purchase
> Belle Air District Sewer Main Easements
> Dry Weather Flow Monitor at 7th Avenue
> Neighborhood Sewer Pump Station Security and Aesthetic Improvements
> Olympic Pump Station Rehab and Force Main
> Pump Station Replacement Program
> Renewable Energy Study for Utility Facilities
> Sanitary Sewer Condition Assessment Project
> Trenton Drive Wastewater Main Replacement Project
> Vactor Equipment Purchase
> Video Inspection Truck Equipment Purchase
> Wastewater Pipeline Repair Program
> Wastewater System Master Plan Update

**PROJECTS REMOVEO FROM BUOGET**
> Mastick Avenue Wastewater Main Replacement Project (completed)
> SCADA for Wastewater Facilities (completed)

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

## WASTEWATER CAPITAL 2011-16 WORK PROGRAM
## FUNDING SUMMARY

| Project | Total Project Cost | Prior Years Funding | 2011-12 | 2012-13 | 2013-14 | 2014-15 | 2015-16 |
|---|---|---|---|---|---|---|---|
| **Wastewater Capital** | | | | | | | |
| Backhoe Equipment Purchase | 113,000 | 0 | 0 | 113,000 | 0 | 0 | 0 |
| Belle Air District Sewer Main Easements | 50,000 | 50,000 | 0 | 0 | 0 | 0 | 0 |
| Dry Weather Flow Monitor at 7th Avenue | 246,778 | 65,000 | 181,778 | 0 | 0 | 0 | 0 |
| Kains to Angus Sewer Bypass | 1,225,000 | 0 | 166,636 | 1,058,364 | 0 | 0 | 0 |
| Marine Mammal Center Shade Structure Construction | 103,076 | | 103,076 | 0 | 0 | 0 | 0 |
| Neighborhood Sewer Pump Station Security and Aesthetic Improvements | 97,526 | | 0 | 97,526 | 0 | 0 | 0 |
| Olympic Pump Station Rehab and Force Main | 1,331,851 | 691,310 | 640,541 | 0 | 0 | 0 | 0 |
| Pump Station Replacement Program | 3,393,868 | 0 | 0 | 1,091,118 | 1,134,763 | 1,167,987 | 0 |
| Renewable Energy Study for Utility Facilities | 40,000 | 40,000 | 0 | 0 | 0 | 0 | 0 |
| Sanitary Sewer Condition Assessment Project | 1,322,434 | 995,000 | 327,434 | 0 | 0 | 0 | 0 |
| Sharp Park Neighborhood Private Sewer Lateral Grant Program | 213,541 | 0 | 113,541 | 25,000 | 25,000 | 25,000 | 25,000 |
| Trenton Drive Wastewater Main Replacement Project | 1,387,506 | 115,000 | 651,195 | 621,311 | 0 | 0 | 0 |
| Vactor Equipment Purchase | 435,000 | | | 435,000 | 0 | 0 | 0 |
| Video Inspection Truck Equipment Purchase | 215,000 | | 215,000 | 0 | 0 | 0 | 0 |
| Wastewater Pipeline Repair Program | 16,597,312 | 381,626 | 238,272 | 2,181,370 | 4,598,681 | 4,598,681 | 4,598,682 |
| Wastewater System Master Plan Update | 465,420 | 465,420 | 0 | 0 | 0 | 0 | 0 |
| **Total** | $27,237,312 | $2,803,356 | $2,637,473 | $5,622,689 | $5,758,444 | $5,791,668 | $4,623,682 |

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

## BACKHOE EQUIPMENT PURCHASE

**PROJECT DESCRIPTION:** The Streets, Storm, and Wastewater Divisions share one (1) backhoe to complete all tasks related to excavation, plate lifting, material lifting, and asphalt repair. The Divisions must wait to do jobs on the availability of a backhoe or request use of the Water Division backhoe if available. Moreover; the use of the "Asphalt Zipper" has further increased the need for another backhoe.

Given the variety of demand for this important piece of equipment, the acquisition of a backhoe for the primary use of the Wastewater Division will allow for more preventative maintenance tasks that require serious excavation and lifting, as well as the capability to quickly respond to sewer system overflows before sewage reaches the storm drain system.

**PROJECT NUMBER:** Not Yet Assigned

**PROJECT MANAGER:** Central Garage Manager

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** Increases the Division's capability to conduct preventative maintenance and to respond to emergency sewer system overflows as mandated by the requirements imposed by the State of California.

**LIFE EXPECTANCY:** 10 years

**PROJECTED START DATE:** 2012

**PROJECTED COMPLETION DATE:** 2013

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Total Appropriations | 2012-13 Request |
|----------------|---------------------|-----------------|
| Wastewater Capital | 113,000 | 113,000 |
| **Total** | **$113,000** | **$113,000** |

**ONGOING FINANCIAL IMPACT:** Replacement of will be scheduled into the Equipment Reserve Fund.

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

## BELLE AIR DISTRICT SEWER MAIN EASEMENTS

**PROJECT DESCRIPTION:** The previously completed Belle Air Phase II Sewer Main Improvement Project connected the downstream end of the Lomita Outfall project to the Angus Connector Sewer project, thereby giving the City the ability to eliminate the existing sewer main located south of the Belle Air School in environmentally-sensitive wetlands. A final work effort of securing easements with the San Francisco International Airport (SFIA) and the Peninsula Corridor Joint Powers Board (PCJPB) is necessary to complete the project.

Access to certain locations related to City utility systems and other facilities requires that the abandoned easements be replaced with new ones in SFIA and PCJPB property on the extension of First Avenue near Belle Air School.

**PROJECT NUMBER:** 84332

**PROJECT MANAGER:** Associate Engineer

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** This project guarantees access to certain City utility and other facilities.

**LIFE EXPECTANCY:** 50 years

**2010-11 STATUS:** Surface access easement was obtained from SFIA. Still working to secure underground utility improvement easements. Once secured, utility abandonment is planned to occur in conjunction with the Lions Field Synthetic Turf Capital Improvement Project.

**2011-12 WORK PLAN:** Complete the securing of underground utility easements and abandon the pipeline within the wetlands area by removing or filling the existing unused pipe.

**PROJECTED COMPLETION DATE:** June 2012

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 50,000 | 40,360 | 0 | 0 | 50,000 |
| **Total** | **$50,000** | **$40,360** | **$0** | **$0** | **$50,000** |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0610: Design | 9,640 | 0 | 13,270 | 0 | 22,910 |
| 0620: Construction | 0 | 0 | 27,090 | 0 | 27,090 |
| **Total** | **$9,640** | **$0** | **$40,360** | **$0** | **$50,000** |

**ONGOING FINANCIAL IMPACT:** This project may require the payment of an ongoing annual license fee as part of securing the easements. This is estimated in the $1,000 to $5,000 price range.

## DRY WEATHER FLOW MONITOR AT 7TH AVENUE

**PROJECT DESCRIPTION:** This project may result in the installation of a new low flow line, diversion box, valves and associated equipment in order to accurately measure the amount of sewage flow traveling along the 7th Avenue sewer main to the San Bruno/South San Francisco Treatment Plant. The amount of sediment that has built up in this sewage transmission line made it difficult to accurately track the amount of sewage flow from San Bruno to the treatment plant.

Efforts are currently underway to investigate the sewage main to determine if there is a better location to place a flow meter or if modifications to the pipeline are needed. Depending on the outcome of the investigation, project costs may vary from minor to significant.

**PROJECT NUMBER:** 85705

**PROJECT MANAGER:** Deputy Director of Utilities and Operations

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** City's share of the sewage treatment plant operating costs is based on a flow measurement made a number of years ago. It may be financially advantageous to the City if measurement of the flow revealed a reduction from that historical value. Moreover, accurate flow measurement is a sewage industry best management practice that will help the City more effective manage the wastewater collection system.

**LIFE EXPECTANCY:** 50 years

**2010-11 STATUS:** Released RFP and executed contract with design engineering firm to conduct an analysis of the 7th Avenue line to determine the best approach to monitor dry weather flow. The analysis recommended several alternative options, including moving the flow meter to a slightly different location or installing a different type of meter.

**2011-12 WORK PLAN:** Select alternative, and design and construct recommended improvements.

**PROJECTED PROJECT COMPLETION DATE:** June 2012

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 65,000 | 0 | 181,778 | 0 | 246,778 |
| **Total** | **$65,000** | **$0** | **$181,778** | **$0** | **$246,778** |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0610: Design | 0 | 65,000 | 67,714 | 0 | 132,714 |
| 0620: Construction | 0 | 0 | 114,064 | 0 | 114,064 |
| **Total** | **$0** | **$65,000** | **$181,778** | **$0** | **$246,778** |

**ONGOING FINANCIAL IMPACT:** Minimal.

## KAINS TO ANGUS SEWER BYPASS

**PROJECT DESCRIPTION:** This project represents the last necessary portion of the Lower City Interceptor improvement. The crews working on the construction of the Caltrain Grade Separation Project will construct approximately 1,000 feet of 21-inch sewer main between the intersection of Kains Avenue at San Mateo Avenue and the intersection of Angus Avenue at Huntington Avenue. Once complete, the City will consider constructing another 1,000 feet of 8-inch sewer main to reverse the flow of the sewer running along San Mateo Avenue from the Artichoke Joe parking lot and tie the main into the new section constructed by Caltrain.

In addition, a 150-foot section of sewer main near the intersection of Kains and Angus is In immediate need of replacement before the next storm season. This section of sewer experience two sanitary sewer flows in the winter of 2011. The City proposes to replace this section of pipe first, and then evaluate the need for constructing a new sewer main to reverse flows on San Mateo Avenue.

**PROJECT NUMBER:** Not Yet Assigned

**PROJECT MANAGER:** Associate Engineer

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** This project would provide more reliable sewer service and lessen the risk of sanitary sewer overflows.

**LIFE EXPECTANCY:** 50 years

**2010-11 STATUS:** No prior appropriation.

**2011-12 WORK PLAN:** Replace a 150-foot section of sewer main near the intersection of Kains and San Mateo Avenue. If deemed necessary after evaluation, begin design of a sewer main to reverse flow direction near Artichoke Joes. Construction would occur the following year.

**PROJECTED PROJECT COMPLETION DATE:** November 2012

**PROJECT-RELATED APPROPRIATIONS:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 0 | 0 | 166,636 | 1,058,364 | 1,225,000 |
| **Total** | **$0** | **$0** | **$166,636** | **$1,058,364** | **$1,225,000** |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0610: Design | 0 | 0 | 72,158 | 63,270 | 135,428 |
| 0620: Construction | 0 | 0 | 94,478 | 995,094 | 1,089,572 |
| **Total** | **$0** | **$0** | **$166,636** | **$1,058,364** | **$1,225,000** |

**ONGOING FINANCIAL IMPACT:** Minimal, other than routine maintenance.

## MARINE MAMMAL CENTER SHADE STRUCTURE CONSTRUCTION

**PROJECT DESCRIPTION:** The Marine Mammal Center is a non-profit marine mammal rehabilitation facility operating under a letter of authorization from the National Marine Fisheries Service. In June 2009, the Center opened a renovated facility which included markedly enhanced pens and pools for holding and treating patients, a state of the art water filtration system, a fully equipped laboratory for the performance of on-site diagnostics, a pathology facility, extensive and purposefully designed support areas for food storage and preparation, and a separate room for medical record-keeping that also facilitates the dialog of clinicians, support staff and volunteers in managing cases.

The goal of this project is to assist in the rescue and rehabilitation of marine mammals that have been adversely affected by funding the construction of shade structures for three new intensive care patient pools. This is part of a larger project of pens, fencing, and life support for the Center's Intensive Care and Quarantine Unit. Specifically, the funding would go specifically to the construction of steel framework, metal roofing and the labor and parts necessary to complete a 72' long 8' foot wide shade structure along three large animal pools. All construction activities will be managed by the Marine Mammal Center.

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** The Marine Mammal Center rescues and provides veterinary care for ill and injured marine mammals due to damaging effects caused by human activity, including discharges of raw or partially treated sewage. This project is part of a negotiated settlement between the City and the State Regional Water Quality Control Board and Baykeeper.

**LIFE EXPECTANCY:** N/A

**2010-11 STATUS:** New program.

**2011-2012 WORK PLAN:** Initiate and complete shade structure construction. City to submit funds directly to the Marine Mammal Center that will hold the funds in a segregated account.

**PROJECTED COMPLETION DATE:** December 2011.

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 0 | 0 | 103,076 | 0 | 103,076 |
| **Total** | **$0** | **$0** | **$103,076** | **$0** | **$103,076** |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0620: Construction | 0 | 0 | 103,076 | 0 | 103,076 |
| **Total** | **$0** | **$0** | **$103,076** | **$0** | **$103,076** |

**ONGOING FINANCIAL IMPACT:** No future costs to be incurred by the City. The Marine Mammal Center will fund all future maintenance costs.

## NEIGHBORHOOD SEWER PUMP STATION SECURITY AND AESTHETIC IMPROVEMENTS

**PROJECT DESCRIPTION:** This project will provide exterior improvements to various sewer pump stations located in neighborhoods throughout the City with the objective of making the buildings and other facilities more secure, providing a more aesthetic appearance, and utilizing materials that will require less maintenance.

There are currently six (6) sewer pump stations in need of upgrading. The anticipated project will include an initial needs assessment for all pump stations that will be used to estimate the cost and develop criteria for prioritizing improvement recommendations. Work will then be completed in phases as funding allows. Estimated cost has been revised to be expressed in future dollars.

**PROJECT NUMBER:** Not Yet Assigned

**PROJECT MANAGER:** Deputy Director of Public Services

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** This project is intended to enhance the appearance and image of City facilities. The project also enhances customer service by increasing reliability through security improvements.

**LIFE EXPECTANCY:** 20+ years

**PROJECTED START DATE:** 2012

**PROJECTED COMPLETION DATE:** 2013

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Total Appropriations | 2012-13 Request |
|---|---|---|
| Wastewater Capital | 97,526 | 97,526 |
| **Total** | **$97,526** | **$97,526** |

**ONGOING FINANCIAL IMPACT:** Minimal, other than routine maintenance. Damage and consequent costs of repair may be avoided because of better physical security of pumps.

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

## OLYMPIC PUMP STATION REHAB AND FORCE MAIN

**PROJECT DESCRIPTION:** The original intent of the project was to rehabilitate the significantly outdated Olympic Pump Station located off Olympic Court at the north boundary of the City. It would also have replaced the force main running from the pump station, down Oakmont Drive, to a manhole at Oakmont and Evergreen Drive. However, as a potentially more cost effective alternative, the City has pursued conversations with the Westborough County Water District (Westborough) and the City of Daly City (Daly City) to abandon the pump station entirely by installing a short section of sewer main that would connect to the Westborough sewer system. This would reduce both the cost of the project and future operating expenses.

The City is in negotiations with Daly City and Westborough to pay sewer connection fees to allow San Bruno residents to discharge sewage into the Westborough District collection system and have it treated at Daly City's treatment plant.

**PROJECT NUMBER:** 84336

**PROJECT MANAGER:** Associate Engineer

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** Breakdown of this equipment or loss of power at this pump station will result in possible discharges of raw sewage into street drains and other properties that would adversely impact public health and collection system reliability.

**LIFE EXPECTANCY:** 50 years

**2010-11 STATUS:** Continued discussions with Westborough and Daly City to reach an agreement to abandon the pump station.

**2011-12 WORK PLAN:** If a mutually beneficial agreement between Westborough, Daly City, and the City of San Bruno can be reached, staff will work to finalize the agreement and any connection fees, and award a construction project to abandon the station. If a mutually beneficial agreement cannot be reached, the City may need to explore other alternatives or continue with complete rehabilitation. The appropriation request for 2011-12 assumes that the station abandonment will proceed, and includes estimated costs for abandonment and connection fees.

**PROJECTED COMPLETION DATE:** June 2012.

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 691,310 | 687,817 | 640,541 | 0 | 1,331,851 |
| Total | $691,310 | $687,817 | $640,541 | $0 | $1,331,851 |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0610: Design | 3,493 | 0 | 29,682 | 0 | 33,175 |
| 0620: Construction | 0 | 0 | 1,298,676 | 0 | 1,298,676 |
| Total | $3,493 | $0 | $1,328,358 | $0 | $1,331,851 |

**ONGOING FINANCIAL IMPACT:** Reduces long-term maintenance and equipment costs.

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

## PUMP STATION REPLACEMENT PROGRAM

**PROJECT DESCRIPTION:** The City operates six sanitary sewer pump (lift) stations to move wastewater from homes and businesses toward the wastewater treatment plant in South San Francisco.  As these stations approach the end of their useful life, staff performs an evaluation to determine the extent of rehabilitation needed or if they can be abandoned and replaced with a simple gravity pipe.  Indeed, the City recently abandoned Crystal Springs Pump Station and is evaluating the possibility of abandoning the Olympic Pump Station.  In the coming years, additional pump stations will need replacement/ rehabilitation including:

- ❑ Spyglass Pump Station
- ❑ Lomita Pump Station
- ❑ Crestmoor Pump Station

**PROJECT NUMBER:** Not Yet Assigned

**PROJECT MANAGER:** Associate Engineer

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** The project will ensure continued reliability of the pump stations and the City's wastewater collection system.

**LIFE EXPECTANCY:** 40 years

**PROJECTED PROJECT START DATE:** 2012

**PROJECTED PROJECT COMPLETION DATE:** 2015

**PROJECT-RELATED APPROPRIATIONS:**

| Funding Source | Total Appropriations | 2012-13 Request | 2013-14 Request | 2014-15 Request |
|----------------|----------------------|-----------------|-----------------|-----------------|
| Wastewater Capital | 3,393,868 | 1,091,118 | 1,134,763 | 1,167,987 |
| **Total** | **$3,393,868** | **$1,091,118** | **$1,134,763** | **$1,167,987** |

**ONGOING FINANCIAL IMPACT:** Replacing the deteriorating stations will reduce maintenance burden.

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

## RENEWABLE ENERGY STUDY FOR UTILITY FACILITIES

**PROJECT DESCRIPTION:** The City operates numerous facilities including sewer lift pump stations, water pump station and water well that consume significant amounts of electricity. All electricity consumed comes from the PG&E power grid. While energy from PG&E is a cleaner form of electricity than most other states due to California's low use of electricity derived from coal, much of that energy is still derived from nonrenewable sources. This project will evaluate the City's water and wastewater facilities to determine if there are opportunities to utilize renewable energy in the form of solar or wind generated power. The findings from the study will be incorporated into any pump station or well rehabilitation project where such renewable energy improvements are possible.

**PROJECT NUMBER:** 85706

**PROJECT MANAGER:** Management Analyst

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** Supplementing power consumption with renewable energy will reduce the City's carbon footprint and indirectly decrease air pollution.

**LIFE EXPECTANCY:** 10 years.

**2010-11 STATUS:** Issued RFP to select a specialized energy efficiency firm to study utility facilities.

**2011-12 WORK PLAN:** Complete final report.

**PROJECTED PROJECT COMPLETION DATE:** October 2011

**PROJECT-RELATED APPROPRIATIONS:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Water Capital | 10,000 | 10,000 | 0 | 0 | 10,000 |
| Wastewater Capital | 10,000 | 10,000 | 0 | 0 | 10,000 |
| Energy Efficiency Block Grant (ARRA) | 20,000 | 19,000 | 0 | 0 | 20,000 |
| Total | $40,000 | $39,000 | $0 | $0 | $40,000 |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0640: Study | 0 | 1,000 | 39,000 | 0 | 40,000 |
| Total | $0 | $1,000 | $39,000 | $0 | $40,000 |

**ONGOING FINANCIAL IMPACT:** The use of renewable energy will decrease the amount of expenditures needed for electricity costs. This will likely make a significant impact in the future as energy costs are predicted to continue their rise.

## SANITARY SEWER CONDITION ASSESSMENT PROJECT

**PROJECT DESCRIPTION:** This project performs the work necessary to conduct a full sanitary sewer condition assessment as required by the City's Sanitary Sewer Management Plan (SSMP), and the settlements with the Regional Water Quality Control Board and Baykeeper. As part of the "Measures and Activities" section of the SSMP, the City must conduct a thorough condition assessment of the sanitary sewer system that entails closed circuit televising (CCTV) and smoke testing.

This project aims to complete video inspection of the entire sewer collection system within five years. The City previously awarded a contract to perform all video inspection activities. However, due to the deteriorated condition of some of the sewer mainline segments, video inspecting some segments of the collection system is not feasible. For these sections, the City will have to make isolated spot repairs or use a different type of camera.

**PROJECT NUMBER:** 84337

**PROJECT MANAGER:** Deputy Director of Utilities & Operations

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** This project will provide mandated assessment of the sewer collection system infrastructure along with proper and efficient management, operation and maintenance of sanitary sewer systems. The SSMP's intent is to reduce the number and frequency of sanitary sewer overflows (SSOs) and decrease the risk to human health and the environment caused by SSOs.

**LIFE EXPECTANCY:** On-going

**2010-11 STATUS:** Continued with video inspection of the collection system. Additional funding will be needed to conduct repairs to the main segments where a video camera would not fit due to blockages, offset or deteriorated pipe conditions.

**2011-12 WORK PLAN:** Complete remaining video inspection. Conduct spot repairs and CCTV sections where video camera previously would not fit. Integrate data with the Computerized Maintenance Management System (CMMS). The additional requested appropriation for 2011-12 is only a planning estimate. A more refined number will be available after the first pass of the entire system is complete and staff has a better estimate on the number of mainline sections needing repair to allow video inspection.

**PROJECTED COMPLETION DATE:** June 2012

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 995,000 | 208,089 | 327,434 | 0 | 1,322,434 |
| **Total** | **$995,000** | **$208,089** | **$327,434** | **$0** | **$1,322,434** |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0620: Construction | 623,453 | 130,000 | 520,523 | 0 | 1,273,976 |
| 0640: Study | 4,625 | 28,833 | 15,000 | 0 | 48,458 |
| **Total** | **$628,078** | **$158,833** | **$535,523** | **$0** | **$1,322,434** |

**ONGOING FINANCIAL IMPACT:** This condition assessment will allow the Department to appropriately target future efforts to rehabilitate wastewater mains.

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

## SHARP PARK NEIGHBORHOOD PRIVATE SEWER LATERAL GRANT PROGRAM

**PROJECT DESCRIPTION:** The City has observed that an unusually high flow of wastewater passes through the Sharp Park Sewer Pump Station relative to the size of the school and number of homes serviced by the station. In addition, large rain events bring an even higher flow rate through the pump station. This leads staff to believe that the sewer laterals connecting homes to the sewer mains may be cracked or otherwise damaged to the point where a significant amount of groundwater is seeping into the sewer system. This is what likely led to several large sanitary sewer overflows in the past.

While the capacity of the Sharp Park Pump Station has been increased to handle the large flows, the City still needs to address the infiltration and inflow of groundwater or rainwater into the sewer system. The City intends to achieve this goal by making funds available for lateral repair/replacement to homeowners that connect to mains that flow to the Sharp Park Pump Station. Interested homeowners will be required to submit a grant application to the City and then hire a private company to conduct a video inspection of their private lateral. The City will reimburse the homeowner 50% of the cost of the CCTV inspection, up to a maximum amount of $150.

Homeowners deemed to have a defective lateral will be reimbursed for half of the cost to repair or rehabilitate the lateral, up to a maximum of $1,700. Homeowners may use their own contractor or one of the contractors with whom the City has previously negotiated a low-bid price. The City will provide the grant funds to the homeowner upon the contractor's satisfactory completion of the work. The goal of the program is to replace 115 of the approximately 300 laterals in the Sharp Park neighborhood by October 20, 2015, after which new flow measurements will be taken to assess program effectiveness.

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** This program, intended to reduce sanitary sewer overflows, is part of a negotiated settlement between the City and the State Regional Water Quality Control Board and Baykeeper.

**LIFE EXPECTANCY:** New laterals may last anywhere from 25 to 50 years.

**2010-11 STATUS:** New program.

**2011-2012 WORK PLAN:** Establish a list of contractors to perform the video inspection and lateral repair work for a low-bid price. Advertise and launch the program.

**PROJECTED COMPLETION DATE:** October 2015

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 0 | 0 | 113,541 | 100,000 | 213,541 |
| Total | $0 | $0 | $113,541 | $0 | $213,541 |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0620: Construction | 0 | 0 | 113,541 | 100,000 | 213,541 |
| Total | $0 | $0 | $113,541 | $100,000 | $213,541 |

**ONGOING FINANCIAL IMPACT:** Operations staff will provide in-kind support and inspection of the video inspection and lateral repairs/replacement.

## TRENTON DRIVE WASTEWATER MAIN REPLACEMENT PROJECT

**PROJECT DESCRIPTION:** This project will remove and replace the main wastewater line behind Trenton Drive in an area with limited access for inspections and maintenance. Staff has identified this section of piping as a problem area subject to breaks and sanitary sewer overflows. Tree removal and development of an all access road will also be included in this project scope.

**PROJECT NUMBER:** 85704

**PROJECT MANAGER:** Associate Engineer

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** Sanitary sewer overflows are serious health threats that can also cause property damage. Repairing damaged pipelines will help to reduce sanitary sewer overflows, thereby reducing the potential for liability to the City. Additionally, correcting problem areas will reduce the cost associated with performing stopgap maintenance efforts.

**LIFE EXPECTANCY:** 50 years

**2010-11 STATUS:** No work accomplished.

**2011-12 WORK PLAN:** Prepare a scope of services and release an RFP to select a qualified engineering firm. Award a design contract and begin design. A more accurate construction cost estimate will be available once the design is complete to the 35% level. Begin construction in 2012.

**PROJECTED COMPLETION DATE:** November 2012

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-13 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 115,000 | 96,746 | 651,195 | 621,311 | 1,387,506 |
| Total | $115,000 | $96,746 | $651,195 | $621,311 | $1,387,506 |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-13 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0610: Design | 17,596 | 658 | 226,630 | 0 | 244,884 |
| 0620: Construction | 0 | 0 | 521,311 | 621,311 | 1,142,622 |
| Total | $17,596 | $658 | $747,941 | $621,311 | $1,387,506 |

**ONGOING FINANCIAL IMPACT:** Will reduce the cost of overtime needed to respond to sanitary sewer overflows that occur in this area.

## VACTOR EQUIPMENT PURCHASE

**PROJECT DESCRIPTION:** A vacuum-combination unit (Vactor) is a relatively large truck that has the ability to force a high-powered jet of water to unplug a clogged sewer main, suck up dirt and grease during an excavation as well as remove grease and other debris from lift station wet wells. The Wastewater Division recently replaced its hydraulic jetter a Vactor, and shares the operation of a 10-yard Vactor with the Stormwater Division. In order to further increase the Division's ability to respond to sewer system overflows and aid in routine preventative maintenance, staff proposes adding an another 10-yard Vactor to the fleet in the near future. Having the ability to deploy three Vactors simultaneously would enable the City to better meet the State's Wastewater Discharge Requirements and the pledges made in the City's Sewer System Management Plan to sufficiently conduct both proactive maintenance and emergency repair of sewer mains. Moreover, the Stormwater Division will need to increase their frequency of storm drain catch basin servicing to meet provisions of the Municipal Regional Stormwater Permit, resulting in less time for the existing 10-yard Vactor to perform Wastewater activities.

**PROJECT NUMBER:** Not Yet Assigned

**PROJECT MANAGER:** Central Garage Manager

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** Increases the Division's capability to conduct preventative maintenance and to respond to emergency sewer system overflows as mandated by the requirements imposed by the State of California.

**LIFE EXPECTANCY:** 10 years

**PROJECTED PROJECT START DATE:** 2013

**PROJECTED PROJECT COMPLETION DATE:** 2013

**PROJECT-RELATED APPROPRIATIONS:**

| Funding Source | Total Appropriation | 2012-13 Request |
|---|---|---|
| Wastewater Capital | 435,000 | 435,000 |
| **Total** | **$435,000** | **$435,000** |

**ONGOING FINANCIAL IMPACT:** Replacement of will be scheduled into the Equipment Reserve Fund.

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

## VIDEO INSPECTION TRUCK EQUIPMENT PURCHASE

**PROJECT DESCRIPTION:**  A video inspection truck is a vehicle specifically outfitted with cameras, data collection equipment and software that allows wastewater crews to run a camera down sewer main lines to check for blockages and survey the general condition of the pipe.  Currently, when a wastewater crew is deployed to eliminate a blockage or perform routine maintenance on a section of pipe—being that the issue of concern is underground—they do so not entirely sure of the exact condition or that the solution.  Once deployed, the video inspection truck will allow crews to accurately identify problem conditions and verify and the corrective measures taken finished the job.

**PROJECT MANAGER:**  Central Garage Manager

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:**  The City's recently approved Sanitary Sewer Overflow (SSO) Reduction Plan mandates video inspection of locations immediately after an SSO, crews to video inspect a certain percentage of mainlines after routine sewer cleaning to ensure quality control, and an ongoing routine video inspection program of all City sewer mains..

**LIFE EXPECTANCY:**  10 years

**2010-11 STATUS:**  New project

**2011-12 WORK PLAN:** Develop and complete specifications, bid and procure equipment.

**PROJECTED COMPLETION DATE:**  June 2012

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 0 | 0 | 215,000 | 0 | 215,000 |
| Total | $0 | $0 | $215,000 | $0 | $215,000 |

| Line Item Expenditures | Prior Expenses | 2009-10 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| Equip Purchase | 0 | 0 | 215,000 | 0 | 215,000 |
| Total | $0 | $0 | $215,000 | $0 | $215,000 |

**ONGOING FINANCIAL IMPACT:**  Replacement of will be scheduled into the Equipment Reserve Fund.

## WASTEWATER PIPELINE REPAIR PROGRAM

**PROJECT DESCRIPTION:** This program will undertake the repair of sewer manholes and segments of pipelines that are in need of rehabilitation, as well as funding large mainline spot repairs. Each year, locations are identified that are found to have significant problems, such as broken or seriously leaking pipes, manholes that are found to be structurally or hydraulically inadequate, pipeline conditions that restrict flow, or chronic maintenance locations that can only be remedied by repairs. Many problem areas are discovered during ongoing sewer video inspections. That information is then combined with maintenance histories to prioritize areas for repair. The top priority for repairs are conditions that constrict flow which in turn could cause a sanitary sewer overflow.

Those segments with minor damages that require immediate attention are funded through the Wastewater Division's operating budget. Other segments will be bundled together for construction as separate capital projects (e.g. Mastick Avenue). The project cost is based on the 2009-10 Rate Study and may be modified to some degree depending on the specific capital improvement program recommended by the Sewer System Master Plan.

**PROJECT NUMBER:** 84322

**PROJECT MANAGER:** Associate Engineer

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** Sanitary sewer overflows are serious health threats that can also cause property damage. Under settlements with the Regional Water Quality Control Board and Baykeeper, the City must dramatically reduce the number of sanitary sewer overflows (SSOs) within a very short timeframe.

**LIFE EXPECTANCY:** 50 years.

**2010-11 STATUS:** Completed a major spot repair of problem sewer main on Fleetwood Drive. In addition, engineering provided design and inspection assistance to the Wastewater Division for several significant SSO and spot repair events.

**2011-12 WORK PLAN:** Provide significant engineering design and construction inspection assistance to the Wastewater Division for SSO events and spot repairs. Schedule design and construction of future main rehabilitation projects according to revised Sewer System Master Plan.

**PROJECTED COMPLETION DATE:** Ongoing program.

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 381,626 | 12,656 | 238,272 | 15,977,414 | 16,597,312 |
| Total | **$381,626** | **$12,656** | **$238,272** | **$15,977,414** | **$16,597,312** |

| Line Item Expenditu | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0610: Design | 17,582 | 2,886 | 123,938 | 2,360,871 | 2,505,277 |
| 0620: Construction | 279,568 | 68,934 | 126,990 | 13,616,543 | 14,092,035 |
| Total | **$297,150** | **$71,820** | **$250,928** | **$15,977,414** | **$16,597,312** |

**ONGOING FINANCIAL IMPACT:** Ongoing project to be funded each fiscal year. The costs above reflect only work to be done in the next five years. Additional appropriations will be required in the future.

City of San Bruno
2011-12 Budget

Wastewater Enterprise Fund
Capital Improvement Program

## WASTEWATER SYSTEM MASTER PLAN UPDATE

**PROJECT DESCRIPTION:** The wastewater system master plan was last revised in 2000 and requires significant updating and re-analysis. This work includes modeling of the City's wastewater collection systems to reflect changes and upgrades made via CIP projects and land development carried out over the last ten years. Once complete, the new master plan will provide additional focus for mainline and pump station rehabilitation work that has been incorporated into the recently completed wastewater rate study. The result will be a more reliable and efficient sewer service.

**PROJECT NUMBER:** 84338

**PROJECT MANAGER:** Associate Engineer

**PRIORITY FOCUS/MASTER PLAN JUSTIFICATION:** This project will develop a capital improvement plan aimed at preventing sanitary sewer overflows and meet requirements of the Regional Water Quality Control Board Cease and Desist Order and the Consent Decree with Baykeeper.

**LIFE EXPECTANCY:** 8-12 years.

**2010-11 STATUS:** Through an RFP process, selected and awarded a contract to a specialized engineering firm to develop and complete the master plan. Gathered wastewater system asset information and monitored infiltration and inflow during the rainy season.

**2011-12 WORK PLAN:** Complete all data collection and model development, and complete the master plan report.

**PROJECTED COMPLETION DATE:** March 2012

**PROJECT-RELATED APPROPRIATIONS AND EXPENSES:**

| Funding Source | Previously Funded | Carry-Over Appropriations | 2011-12 Request | 2012-16 Request | Total Appropriations |
|---|---|---|---|---|---|
| Wastewater Capital | 465,420 | 321,925 | 0 | 0 | 465,420 |
| Total | $465,420 | $321,925 | $0 | $0 | $465,420 |

| Line Item Expenditures | Prior Expenses | 2010-11 Expenses | 2011-12 Budget | 2012-16 Request | Total Expenditures |
|---|---|---|---|---|---|
| 0640: Study | 810 | 142,685 | 321,925 | 0 | 465,420 |
| Total | $810 | $142,685 | $321,925 | $0 | $465,420 |

**ONGOING FINANCIAL IMPACT:** Will allow future CIP project funds to be appropriately expended and reduce the incidence of sanitary sewer overflows.

PAGE LEFT BLANK INTENTIONALLY

## Exhibit B

### SEP I

The City completed a Master Plan in 2002, which indicated that the Sharp Park basin has a high level of I/I. The City later conducted smoke testing in the Sharp Park basin to determine whether the high levels of I/I were caused by inflow. The smoke testing confirmed that the basin has limited sources of inflow. These results suggest that the high rates of I/I in the Sharp Park basin are caused by infiltration from private laterals and/or from unknown sources.

The Sharp Park basin has approximately 300 laterals that flow to mains that then flow to the Sharp Park Pumping Station. The goal of the Private Sewer Lateral Program is to reduce the rate of I/I in the Sharp Park Basin from these laterals by incentivizing homeowners located in the basin to repair or replace their defective private sewer laterals. The City intends to achieve this goal by making $199,622 in grant funds available for lateral repair/replacement to homeowners that discharge into mains that flow to the Sharp Park pump station.

Interested homeowners will be required to submit a grant application to the City, by a specified deadline. Homeowners will be required to hire a private company to conduct a CCTV inspection of their private lateral. The City will reimburse the homeowner 50% of the cost of the CCTV inspection, up to a maximum amount of $150. Using non-SEP funds, City staff will observe the CCTV inspections and assign a rating of one to five to each inspected lateral, with five being in a failure condition and one being in excellent condition.

Homeowners with defective private laterals of a defect rating of five through three will be eligible for a grant from the City for repair or replacement of their private sewer lateral. The City will provide the homeowner with a list of contractors with whom the City has previously negotiated a pre-bid set price. The homeowners will have the option of using one of the contractors on the City's list or a contractor of their choice. The City will provide the grant funds to the homeowner upon the contractor's satisfactory completion of the work.

**Exhibit C**

**SEP II**

The Marine Mammal Center is a non-profit marine mammal rehabilitation facility operating under a letter of authorization from the National Marine Fisheries Service.  In June 2009, the Center opened a renovated facility which included markedly enhanced pens and pools for holding and treating patients, a state of the art water filtration system, a fully equipped laboratory for the performance of on-site diagnostics, a pathology facility, extensive and purposefully designed support areas for food storage and preparation, and a separate room for medical record-keeping that also facilitates the dialog of clinicians, support staff and volunteers in managing cases.

The goal of this SEP is to assist in the rescue and rehabilitation of marine mammals that have been adversely affected by human activities by contributing $95,928 to the installation of shade structures for three new intensive care patient pools.  This is part of a larger project of pens, fencing, and life support for the Center's Intensive Care and Quarantine Unit.

The SEP funding would go specifically to the construction of steel framework, metal roofing and the labor and parts necessary to complete a 72' long 8' foot wide shade structure along three large animal pools.

This scope of work will be done by a single contractor, Gonsalves and Stronck, and has an estimated cost of $95,928.

The shade structure that is part of the SEP covers pools P1, P2 and P3 as shown below:



The City will fund the Marine Mammal Center Rebuild Project in the total amount of $95,928.

| Work | Milestone | Value |
|------|-----------|-------|
| Notice to Proceed | 7/01/2011 | |
| Tube Steel Supports | 8/01/2011 | $39,627 |
| Unistrut Supports | 8/07/2011 | $3,910 |
| Corrugated Metal Roof | 8/07/2011 | $10,798 |
| Chain Link Fence | 8/14/2011 | $15,000 |
| Painting | 8/14/2011 | $3,875 |
| Electrical | 8/21/2011 | $1,500 |
| Contractors Fee | | $5,230 |
| Project Completion Date | 8/22/2011 | |
| Contingency & Insurance @ 20% | | $15,988 |
| | Project Total | $95,9281678952.1 |

1503602.17